SECURITIES INVESTOR PROTECTION CORPORATION and James W. Giddens, as Trustee for the liquidation of the business of A.R. Baron & Co., Inc., Plaintiffs,

v.

BDO SEIDMAN, LLP, Defendant.

No. 98 Civ. 2266(LAP).

United States District Court, S.D. New York.

May 14, 1999.

Stephen P. Harbeck, Securities Investor Protection Corp., Washington, DC, for Securities Investor Protection Corp.

Daniel Haym Weiner, Hughes Hubbard & Reed, New York City, for James W. Giddens.

Michael R. Young, Willkie Farr & Gallagher, New York City, for BDO Seidman, LLP.

### *OPINION*

PRESKA, District Judge.

Plaintiffs, the Securities Investor Protection Corporation ("SIPC") and James W. Giddens as Trustee (the "Trustee") for the liquidation of the business of securities broker-dealer A.R. Baron & Co., Inc. ("Baron"), brought this action against defendant BDO Seidman, LLP ("Seidman") seeking damages for various state law causes of action, such as negligence, fraud and breach of contract. In essence, the action is one seeking recovery for an accountant's misrepresentations. Defendant has now moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on grounds of standing and the failure to state a claim. For the reasons set forth below, defendant's motion is granted.[1]

### BACKGROUND

For purposes of this motion, the facts alleged in plaintiffs' complaint (the "Complaint") are presumed to be true. Seid-

---

1. In considering this motion, I have reviewed the following materials: Memorandum of Law in Support of Motion to Dismiss the Complaint, dated June 4, 1998 ("Def.Mem."); Memorandum of Law in Opposition to De-fendant's Motion to Dismiss the Complaint, dated July 20, 1998 ("Opp.Mem."); Reply Memorandum of Law in Further Support of Motion to Dismiss the Complaint, dated August 14, 1998 ("Reply Mem.").

man is a national accounting firm which served as the independent certified public accountant for Baron, a securities broker-dealer, and which also audited Baron's financial statements for the years 1992 through 1995. (*See* Complaint ¶ 1). Baron achieved notoriety in the 1990's, when the excesses and illicit activities of its management (the "Bressman Team") became widely known. The "Bressman Team," as defined in the Complaint, consisted of such members of Baron's senior management as chief executive officer Andrew Bressman, chief financial officers Mark Goldman and John McAndris, and brokers Roman Okin and Brett Hirsch. (*See id.* ¶ 9). The Bressman Team's illegal activities included the following: (1) fraudulent sales of securities; (2) manipulation of initial public offerings of securities; (3) manipulation of trading in the after-market of those securities for which Baron was the sole or dominant market maker and creation of artificially inflated values for those securities; and (4) frenzied purchases on corporate credit cards for personal expenses that totalled several million dollars. (*See id.* ¶¶ 9, 12). The Complaint alleges that the Bressman Team acted with the express purpose of enriching themselves, their friends and other insiders to the detriment of Baron. (*See id.* ¶ 9). To that end, the Bressman Team "caused Baron to issue false and misleading financial reports, including those audited by Seidman, in order to prolong their fraudulent scheme and increase their personal gain." (*Id.* ¶ 13).

When the unlawful activities at Baron were revealed, criminal indictments were brought against Baron employees. In total, thirteen Baron employees pleaded guilty or were convicted for their participation in fraudulent activity and other criminal wrongdoing at Baron. (*See id.* ¶ 10). Baron itself entered into a guilty plea on one count of enterprise corruption. (*See id.* ¶ 11). Although the complaint asserts that no evidence exists that *all* employees engaged in or assisted the illegitimate activities of the Bressman team, (*see id.*), it does not allege that any individual member of Baron's management was innocent of those activities and could have put a halt to the fraudulent activities.

Plaintiffs contend that Seidman is liable for its failure to audit adequately Baron's financial statements for the years 1992 through 1995. (*See id.* ¶¶ 19, 21, 23, 25). Generally, plaintiffs seek to recover for: (1) Seidman's alleged multiple misrepresentations as Baron's certified public accountant; (2) Seidman's failure to conduct year-end audits of Baron in accordance with generally accepted auditing standards ("GAAS"); (3) Seidman's failure to disclose that Baron did not present fairly its year-end financial statements in accordance with generally accepted accounting principles ("GAAP"); and (4) Seidman's failure to comply with the rules and regulations of the Securities and Exchange Commission ("SEC") governing the practice of independent certified public accountants for SEC registrants. (*See id.* ¶ 1).

Among the most damaging of Seidman's alleged acts as Baron's certified independent accountant was its failure to disclose that Baron lacked adequate reporting systems and internal controls to detect or prevent fraud. (*See id.* ¶¶ 40–44). Plaintiffs allege that Seidman's failure to disclose this information permitted the Bressman Team to hide the true financial state of Baron. For example, the Bressman Team was able to create the illusion that Baron had sufficient net capital by reducing the inventory of "house stocks" through the placement of securities in retail customer accounts and with other broker-dealers, artificially inflating values of securities where Baron was the dominant or sole market maker and understating the amount of loss contingencies disclosed in Baron's year-end financial statements. (*See id.* ¶¶ 14–15).

Plaintiffs also allege that Seidman wrongfully failed to disclose the true financial condition of Baron in its audit reports, such as Seidman's failure to report that Baron was insolvent or in violation of mini-

mum net capital requirements. Like the failure to disclose inadequate internal reporting systems, this failure permitted "Baron to remain in operation and (to) obtain additional property from customers, which would then be appropriated by the Bressman team." (*Id.* ¶ 13). In sum, plaintiffs allege that the direct result of Seidman's improprieties was that, "Baron, SIPC, and Baron's customers, creditors, and regulators were denied the opportunity to take action with respect to the deterioration of Baron's financial condition and its violations of financial responsibility rules." (*Id.* ¶ 45).

At the heart of the Complaint is plaintiffs' contention that Seidman's inadequate performance as Baron's independent auditor created a breach in the regulatory framework of federal securities laws which were designed to protect customers from the harm of broker-dealer failure. Plaintiffs do not state in the Complaint whether SIPC or Baron's customers actually received, read or reviewed the financial statements certified by Seidman. Plaintiffs claim reliance upon those certified financial statements because they were sent to "the SEC, NASD and others" and SIPC, Baron and Baron's customers relied on those entities to ensure Baron's compliance with the applicable regulatory rules. (*See id.* ¶ 54). In furtherance of that argument, plaintiffs contend that the certified financial statements and the independent auditors' report attached to those financial statements, which are required by the securities laws, are "crucial elements of the effective regulatory system." (*Id.* ¶ 17). The Complaint states that Seidman knew or should have known that the "end and aim of its engagement to audit the financial statements of Baron" was to ensure adherence with the regulatory guidelines set forth in SEC Rule 17a–5. (*See id.* ¶ 57).

SIPC brings this action on its own behalf and as the subrogee to the net equity claims of Baron's customers which have been paid by SIPC. (*See id.* ¶ 4). SIPC has provided over $5.5 million for the payment of claims submitted by these customers and administrative expenses of the liquidation. (*See id.* ¶ 47). The Trustee brings this action as (1) the bailee of the fund of customer property entrusted to Baron by customers; (2) as assignee of the rights and claims of customers whose net equity claims have been paid by the Trustee; and (3) as the representative of the estate of Baron in liquidation. (*See id.* ¶ 5). The Trustee was appointed as trustee for the liquidation of Baron pursuant to an order of this Court in *SIPC v. A.R. Baron & Co., Inc.,* No. 96 Civ. 5171 (S.D.N.Y. July 11, 1996) (the "Protective Decree"). Since the establishment of the Protective Decree, the Trustee has paid over $2.5 million to customers and other creditors for which it has received assignments. (*See id.* ¶ 48).

## DISCUSSION

### I. *Motion to Dismiss Standard*

In deciding this motion to dismiss, I must view the complaint in the light most favorable to plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 562 (2d Cir.1985). I must accept as true the factual allegations stated in the complaint, *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), and draw all reasonable inferences in favor of the plaintiffs. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir.1993), *cert. denied,* 510 U.S. 1111, 114 S.Ct. 1055, 127 L.Ed.2d 375 (1994). A motion to dismiss can only be granted if it appears beyond doubt that the nonmoving party can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Even under this liberal standard, however, the plaintiffs' claims suffer from deficiencies that require their dismissal at this time.

## II. *Securities Investor Protection Act Generally*

Congress enacted the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. §§ 78aaa–78*lll* (1994) (the "Act" or "SIPA"), after a business contraction in the securities industry led to a rash of failures among brokerage firms. *See SIPC v. Barbour*, 421 U.S. 412, 415, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). After that contraction, "customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings." *Id.* SIPA was intended to "arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." *Id.* SIPA created a new form of liquidation proceeding that was "applicable only to member firms, designed to accomplish the completion of open transactions and the speedy return of most customer property." *Id.* at 415–16, 95 S.Ct. 1733. Those investors who had left identifiable securities in their names with the broker-dealer or cash balances to be used for investment purposes (which collectively constitute "net equity claims") are entitled to receive such securities and cash from the liquidator before other creditors may share in the estate. *See Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F.Supp. 531, 555 (S.D.N.Y.1990). The Act contemplates that customers' claims will be satisfied to the greatest extent possible from the bankrupt brokerage firm. *See Appleton v. First National Bank of Ohio*, 62 F.3d 791, 794 (6th Cir.1995).

The Act also created SIPC. SIPC is a nonprofit membership corporation to which most broker-dealers are required to belong. 15 U.S.C. § 78ccc(a). SIPC protects customers from broker-dealer insolvencies by insuring the "net equity" of customers' accounts up to $500,000. *See* §§ 78fff–3(a); 78*lll*(11). As defined by SIPA, "net equity" is the amount that the broker would have owed a customer had it liquidated all the customer's holdings on the date SIPC filed for a protective decree, less any outstanding debt the customer owed to the broker. *See* § 78*lll*(11). To encourage the prompt resolution of customer claims, SIPC may advance funds to brokerage customers or to an appointed trustee. *See* § 78fff–3(a–c). To the extent SIPC advances funds, either to the trustee or directly to brokerage customers, it is subrogated to the customers' claims. *See* §§ 78fff–3(a), 78fff–4(c).

## III. *Standing*

■■■ One of the issues before me involves the plaintiffs' standing to bring this action—either on behalf of themselves or on behalf of Baron's customers. The Constitution limits the judicial power of the federal courts to deciding cases or controversies. U.S. Const. art. III, § 2, cl. 1. To have standing, a plaintiff must allege personal injury that is fairly traceable to the defendant's allegedly unlawful conduct and which is likely to be redressed by the requested relief. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1091 (2d Cir.1995) (citing *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). A party must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Standing is a jurisdictional matter and the plaintiff must "allege facts demonstrating that he is the proper party to invoke jurisdictional resolution of the dispute." *Solow v. Stone*, 994 F.Supp. 173, 178 (S.D.N.Y.) (quotation omitted), *aff'd*, 163 F.3d 151 (2d Cir.1998).

Here, the "case or controversy" requirement involves a discussion of the scope of powers that SIPA bestows upon SIPC and the Trustee to assert claims against a third party.

### A. Claims Asserted by the Trustee on Behalf of Baron

■■■ Under SIPA, a Trustee is vested with the "same powers and title with re-

spect to the debtor and the property of the debtor ... as a trustee in a case under Title 11." § 78fff–1. Thus, the scope a SIPC trustee's legal rights when asserted on behalf of the liquidated broker-dealer, and therefore its standing in this action, closely tracks that of a bankruptcy trustee.

The Court of Appeals discussed issues of standing pertaining to a bankruptcy trustee in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir.1991). It is well established that when a bankruptcy trustee brings a claim, it stands in the shoes of the bankrupt corporation and has standing to assert a claim that the bankrupt corporation could have instituted had it not petitioned for bankruptcy. *See Hirsch*, 72 F.3d at 1093 (citing *Wagoner*, 944 F.2d at 118 (collecting cases)). It is also well settled that a bankruptcy trustee generally has no standing to sue a third party on behalf of the estate's creditors. *See Wagoner*, 944 F.2d at 118. Furthermore, the determination of whether a claim properly belongs to creditors as opposed to the debtors is a question of state law. *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir.1989).

In *Wagoner*, a bankruptcy trustee asserted a claim against a broker for the alleged aiding, abetting and undue influencing of a sole shareholder and decision-maker in the making of bad trades that dissipated corporate funds. *Id.* at 119. There, the sole shareholder and decision-maker knew of the bad investments and also actively forwarded them. *See id.* at 120. The Court held that "a claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Id.* at 120. Subsequently, the *Wagoner* rule has been interpreted as resting on a "finding that all relevant shareholders and/or decisionmakers are involved in the fraud." *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34, 36 & n. 1 (S.D.N.Y.1997). *See also In re Mediators*, 105 F.3d 822, 826–27

(2d Cir.1997) (applying *Wagoner* rule when sole individual shareholder and decision-maker was party to fraud); *Lippe v. Bairnco Corp.*, 218 B.R. 294, 302 (S.D.N.Y. 1998) (considering *Wechsler*'s requirement of allegations of "innocent members of management" in the complaint but deciding that standing did not exist because the complaint alleged "sufficient unity between Keene [the company] and [management] defendants to implicate Keene in the alleged wrongdoing"); *Brown v. Deloitte & Touche LLP*, 98 Civ. 6054(JSM), 1999 WL 269901, slip op. at 6 (S.D.N.Y. May 4, 1999) (applying *Wagoner* rule to a sole corporate shareholder).

The Trustee attempts to distinguish *Wagoner* by arguing that New York's adverse interest exception applies here. That legal doctrine is an exception to the general rule in New York that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge. *See Farr v. Newman*, 14 N.Y.2d 183, 187, 250 N.Y.S.2d 272, 275, 199 N.E.2d 369 (1964). The general rule operates on the presumption that the agent has "discharged his duty to disclose to his principal all the material facts coming to his knowledge with reference to the subject of his agency." *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 899, 488 N.E.2d 828 (1985) (quotation omitted). The adverse interest exception rebuts that presumption precisely because the agent is involved in a scheme to defraud the principal for the agent's individual benefit. *See Center*, 66 N.Y.2d at 784, 497 N.Y.S.2d at 899, 488 N.E.2d 828. This exception is narrow, however, and it applies only when the agent has totally abandoned the principal's interests. *See id.* 66 N.Y.2d at 784–85, 497 N.Y.S.2d 898, 488 N.E.2d 828. Thus, the exception does not apply when the agent acts both for himself and for the principal, though the primary motivation for the acts is inimical to the principal. *See In re Crazy Eddie Securities Litig.*,

802 F.Supp. 804, 817 (E.D.N.Y.1992). Plaintiffs argue that because the members of the Bressman Team acted solely for their individual benefit, Baron should not be held responsible for those fraudulent activities.

In *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.,* 212 B.R. 34 (S.D.N.Y.1997), Judge Knapp analyzed the interaction between the adverse interest exception and the *Wagoner* rule. That case involved litigation pertaining to the fallout from a Ponzi scheme involving the Towers Financial Corporation. There, the bankruptcy trustee brought claims against the defendant, attorney for Towers Financial Corporation, alleging that "it had breached its fiduciary duty to the company and committed legal malpractice in failing to stop the fraud 'personally overseen and directed' by Towers' CEO Steven Hoffenberg 'and his cohorts.'" 212 B.R. at 35. There, the Court found that the complaint had not alleged the "existence of an innocent member of Towers' management who would have been able to prevent the fraud had he known about it." *Id.* at 36. The Court noted that absent such an allegation, the trustee did not have standing to assert the claims under *Wagoner*. *See id.* The Court then granted the motion to dismiss but allowed the plaintiffs to replead if there was any member of management who did not know of the ongoing fraud and who, if advised of those facts, would have taken steps to bring the fraudulent conduct to an end. *See id.*

Here, I first note that the Complaint reveals that Baron has pleaded guilty to one count of enterprise corruption in New York State Supreme Court. (*See* Complaint ¶ 11). That pleaded fact strongly suggests the existence of "sufficient unity" between Baron and its management to deprive the Trustee of standing, as the Court found in *Lippe*. Recognizing that the *Wagoner* standard involves *all* manage-

ment or shareholders, however, my decision rests on the absence of any allegation in the Complaint that a member of Baron's management was innocent of the fraud and could have stopped it. The Complaint merely asserts that "no evidence exists that all employees of Baron" were party to the fraudulent or criminal activity. (*See id.*). I do not construe such a general reference as sufficient to grant standing. In their papers, however, the plaintiffs make a passing reference to a compliance officer "who could have taken action or notified regulators."[2] (Opp.Mem. at 29). That reference in a *brief*, however, is insufficient for purposes of standing. Accordingly, the Trustee does not have standing to assert claims on behalf of Baron in the Complaint as it currently exists; defendant's motion is therefore granted on that ground. If he can do so consistent with Fed.R.Civ.P. 11, the Trustee may, within 30 days from the date hereof, replead this claim to allege the existence of an innocent member of Baron's management who could have prevented the fraud.

**B. Claims asserted by SIPC on its Behalf and on Behalf of Baron's Customers and by the Trustee on Behalf of Baron's Customers**

Defendant argues that the Trustee and SIPC lack standing to assert claims on behalf of the customers of Baron and that SIPC lacks authority to assert claims on its behalf. In support of that position, defendant cites Judge Pollack's well-reasoned decision *Mishkin v. Peat. Marwick, Mitchell & Co.,* 744 F.Supp. 531 (S.D.N.Y. 1990). Plaintiffs rely on the decision rendered by the Court of Appeals in *Redington v. Touche Ross & Co.,* 592 F.2d 617 (2d Cir.1978), *rev'd on other grounds,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). A few words about each case is necessary.

In *Redington v. Touche Ross & Co.,* SIPC and a SIPA trustee asserted private

---

**2.** At this juncture, I need not decide whether a compliance officer may be considered as a member of Baron's management or whether such an officer could have prevented the illicit activities.

rights of action under section 17 of the Securities Exchange Act of 1934 against a firm of certified public accountants. In a divided opinion, the Court of Appeals agreed. There, SIPC asserted a right to bring the action "both in its own right and as subrogee of the customers whose claims it has paid." *Redington*, 592 F.2d at 624. The Court of Appeals did not decide whether "SIPC could ever have claim for damages other than on behalf of a broker's customers," *id.* at 624 n. 13, but held that SIPC did have a claim on behalf of customers of a failed broker-dealer due to its common law right of equitable subrogation, *id.* at 624. In finding that SIPC had such a common law right of subrogation, the Court of Appeals drew on principles of insurance law. *See id.* (citing *SEC v. Albert Maguire Securities Co.*, 560 F.2d 569, 574 (3d Cir.1977)).

Also in *Redington*, the SIPA trustee asserted a claim against the accountant-defendant as both the representative of the broker-dealer's estate and as bailee for the customers' property. The Court of Appeals held that the trustee could not assert claims on its own behalf, but it could do so on behalf of customers who were not fully reimbursed by SIPC. *See id.* That finding rested on the trustee's power as bailee of the customer's property. *See id.* at 625. When the Supreme Court reversed the Court of Appeals, it did not disturb these rulings. *See* 442 U.S. 560, 567 n. 7, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *see also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 270 & n. 17, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (declining to express an opinion on the issue of SIPC's ability to assert state-law subrogation rights).

In *Mishkin v. Peat, Marwick, Mitchell & Co.*, Judge Pollack held that a SIPC trustee lacked standing to assert claims against an accountant under SIPA or under common law subrogation principles.[3]

In that case, a SIPC trustee brought claims under the federal securities laws as well as negligence claims against an accounting partnership that had performed an audit for a broker-dealer. Analyzing the SIPA trustee's standing under SIPA, Judge Pollack noted that the "basic scheme of SIPA is to create a preferred class of creditors," 744 F.Supp. at 555, which is linked to customers' net equity claims. Judge Pollack discussed the subrogation rights established in the Act, specifically Section 78fff–3(a) which states, in pertinent part,

> To the extent moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers, in addition to all other rights it may have in law or equity, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this chapter.

§ 78fff–3(a). Net equity claims are those claims asserted by a customer against its failed broker-dealer, the debtor; such claims are "not claims that third parties have defrauded a customer." *Id.* at 556. In addition to finding no statutory language permitting the trustee to prosecute fraud claims against third parties, Judge Pollack found that to allow such an action would defeat the preference system of SIPA that was established by Congress. *See id.* at 557. With respect to the SIPA trustee's common law right to bring suit, Judge Pollack noted that the Court of Appeals' reliance on insurance law as the basis for such a right was inappropriate given that SIPA had its roots in the old Bankruptcy Act. *See id.* at 557–58.

The *Mishkin* and *Redington* decisions are important because of their discussion of the statutory and common law authority to bring suit against a third-party accountant. I next address how each in turn affects standing with regard to the plaintiffs.

---

**3.** Plaintiffs urge me to interpret the *Mishkin* decision as only precluding claims asserted by banks against accountants, as opposed to customers claims against accountants. I find that such a narrow interpretation of that decision is not warranted.

### 1. SIPC's Suit on its own Behalf

■ Plaintiffs point to Section 78ccc(b), which describes SIPC as a non-profit corporation, as statutory authority for standing to assert claims against Seidman. That Section provides that SIPC has "the power (1) to sue and be sued, complain and defend, in its corporate name...." It is this corporate identity, plaintiffs argue, that permits SIPC to sue any tortfeasor. In further support of that argument, plaintiffs cite *Resolution Trust Corp. v. Coopers & Lybrand*, 915 F.Supp. 584, 591 (S.D.N.Y.1996), where the Court held that the Resolution Trust Corporation (the "RTC") had standing to sue an accounting firm on its own behalf because of its corporate identity. Plaintiffs fail to cite any case discussing SIPC's right to sue powers.

Seidman counters that the Supreme Court's decision in H*olmes v. SIPC*, 503 U.S. 258, 270–71, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), robs SIPC of the power to bring claims on its own behalf. In that case, SIPC sought to recover under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1988 ed. and Supp. II), from a shareholder who made fraudulent statements about the prospects of his companies. In *Holmes,* however, SIPC relied on Section 78eee(d), a provision which gives SIPC the right to be heard in a matter pending between other parties at a liquidation hearing. *See* 503 U.S. at 274, 112 S.Ct. 1311. Given the Court's focus on that narrow section of SIPA, *Holmes* does not rob SIPC of standing on its own behalf.

I do not find that SIPC has the authority to assert claims against Seidman on its own behalf.[4] First, I note that the case relied upon by plaintiffs, *RTC v. Coopers & Lybrand,* involves different statutory entities and different statutory schemes. Second, such a result would not be in keeping with the limited rights of SIPC to bring suit, *see Redington,* 592 F.2d at 634 (Mulligan, J., dissenting), and I am not aware of any court that has found that authority to be sufficient. Lastly, and perhaps most importantly, SIPC's argument regarding standing on its own behalf is one that is primarily based on a theory of subrogation to customer claims. For example, the damages SIPC sustained stem from its advance of over $5.5 million to the Trustee from the SIPC Fund.[5] (*See* Complaint ¶ 47; Opp.Mem. at 5). SIPC alleges that Seidman's misrepresentations delayed the eventual exposure of Baron's true financial condition, thus increasing the amount of claims against the SIPC Fund. (*See* Complaint ¶ 47; Opp.Mem. at 6). I therefore turn to SIPC's subrogation powers under SIPA and the common law.

### 2. SIPC Subrogation Powers

■ SIPC argues that it is subrogated to the rights of those customers whose net equity claims were paid with monies advanced by SIPC and that those subrogation rights extend to claims against third parties. In addition to relying on the common law rights established in *Redington,* SIPC relies on Section 78fff–3(a).[6] It is this question of subrogation that produced the differing decisions of *Mishkin* and *Redington.* Although I find the *Mishkin* Court's interpretation of the subrogation powers more faithful to the letter and purpose of the Act, I am bound by *Redington* to find that SIPC has standing to bring suit.

---

4. Assuming *arguendo* that SIPC has standing to assert claims against Seidman on its own behalf, it would be unable to state a claim for fraudulent or negligent misrepresentation. The same deficiencies that Baron's customers suffer from, *i.e.,* the lack of receipt of any of the financial statements prepared by Seidman and the absence of any linking conduct between SIPC and Seidman, applies with equal strength to SIPC.

5. *See* 15 U.S.C. § 78ddd(d) (discussing assessments to be imposed on each of its members for the SIPC fund).

6. *See supra* at 652.

My disagreement with *Redington* is due to its creation of a common law right that circumvents Congressional intent by "ignoring the directive of SIPA that SIPC be subrogated with the rights and priorities provided in [Section 78fff]." *See Redington*, 592 F.2d at 634 (Mulligan, J., dissenting) (quotation omitted). Section 78fff establishes the express but limited subrogation powers authorized by SIPA. *See* § 78fff(a)(3). Had Congress intended to enable SIPC or the trustee to bring suit against a third party, it would have done so. *See Redington*, 592 F.2d at 634 (Mulligan, J., dissenting). Moreover, the Act limits "net equity" to that limited universe of claims by customers against a failed broker-dealer. *See* § 78*lll*(13); § 78fff–2(c)(1)(C) (listing the order of subrogation from debtor's estate). SIPC argues that the addition of the words "in addition to all other rights it may have at or in equity" to § 78fff–3(a) plugs any holes in the statutory authority. Assuming *arguendo* that those additional words cure that defect, it still poses two problems. First, it conflicts with the rest of the Act in that it defeats the purpose of the preference system of creditors set up by SIPA as well as expanding the limited powers of SIPC. Secondly, I question the propriety of using insurance principles as the foundation for SIPC's common law subrogation powers. As Judge Pollack stated, the subrogation powers in SIPA are based on Section 60(e) of the old Bankruptcy Act upon which the Court of Appeals based its holding in *Redington*. *See Mishkin*, 744 F.Supp. at 557–58. Nevertheless, because of the Court of Appeals' holdings in *Redington*, which were undisturbed by the Supreme Court, I am

bound to sustain SIPC's standing on this claim.

### 3. Trustee's Claims on Behalf of Baron's Customers

■ With regard to the Trustee's bringing suit on behalf of Baron's customers, I note at the outset that the Act states that a SIPA trustee may only exercise the powers of a bankruptcy trustee with the addition of those powers set forth in SIPA. 15 U.S.C. § 78fff–1(a). A bankruptcy trustee does not have standing to sue third parties for the fraud committed against individual creditors. *See Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). That said, plaintiffs assert that indirect statutory authority[7] and *Redington* provide the Trustee with standing to assert claims on behalf of customers. As I have noted above, *Redington* gave the SIPC trustee the right to sue an accountant because it found that it was the bailee for a fund of customer property entrusted to it. Although I do not agree with plaintiffs' argument that the statute provides the power to assert such claims, and though I find the dissent's reasoning in *Redington* more persuasive than the majority's, I am bound by *Redington* to hold that the Trustee can bring suit as bailee.

### IV. *Failure to State a Claim*

#### A. Generally

■ Plaintiffs assert claims against Baron's accountant for breach of contract, negligence and fraud. Those claims were identical to those at issue in *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct.

---

7. The Trustee argues that Section 78fff–2(b) gives it the power to assert claims because that section authorizes the Trustee to obtain assignments from customers when it pays their claims. I cannot agree that Section 78fff–2(b), which deals generally with payments to customers in a liquidation proceeding, should be construed so broadly as to permit standing. That section states that payments made "pursuant to this subsection may

be conditioned upon the trustee requiring the claimants to execute ... supporting affidavits, releases and assignments." § 78fff–2(b). When read in the entire context of Section 78fff, it is clear that those assignments relate to payments for net equity claims. And, as stated above, that does not extend the Trustee's authority to bring suit beyond the brokerage firm-customer relationship to include claims against a third party.

177, 74 L.Ed.2d 145 (1982), where the Court held that when those claims are alleged against an accountant, they constitute "a single form of wrongdoing under different names." 686 F.2d at 453. *See also Hirsch v. Arthur Andersen & Co.*, 72 F.3d at 1092 (holding that claims of fraud, negligence, professional malpractice, breach of contract, breach of fiduciary duties were "traceable to one of two events alleged in the complaint"); *In re Wedtech Corp. (Wedtech Corp. v. KMG Main Hurdman)*, 81 B.R. 240, 241 (S.D.N.Y. 1987) (holding that various claims against an accountant, including fraud, malpractice and breach of fiduciary duty, amounted to an action for malpractice). In *Cenco*, the court found that the plaintiff's complaint sought to recover for the accountant's negligent and fraudulent misrepresentations. *See Cenco*, 686 F.2d at 453–54. I find the same to be true here, and, as explained below, under either type of alleged misrepresentation, the plaintiffs have failed to state a claim pursuant to Fed.R.Civ.P. 12(b)(6).

## B. Fraudulent Misrepresentation

■■■■■■ To plead a claim for common law fraudulent misrepresentation properly, a plaintiff must allege the "misrepresentation of a material fact made with scienter that induces reliance to the detriment of the party to whom the misrepresentation is directed." *First Federal Savings and Loan Assoc. v. Oppenheim, Appel, Dixon & Co.*, 629 F.Supp. 427, 435 (S.D.N.Y.1986) (citing *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1359 (S.D.N.Y.1982)); *see also Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987) (same); *Knudsen v. Quebecor Printing (U.S.A.), Inc.*, 792 F.Supp. 234, 240 (S.D.N.Y.1992) (same). A third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment and that the defendant intended the misrepresentation to be conveyed to him. *See Rosen v. Spanierman*, 894 F.2d 28, 33 (2d Cir.1990) (quoting *Peerless Mills, Inc. v. American Telephone and Telegraph Co.*, 527 F.2d 445, 450 (2d Cir.1975)).

Defendant argues that plaintiffs have not sufficiently alleged the element of reliance on the part of Baron's customers because they never received or read the financial statements certified by Seidman. Plaintiffs concede this fact. (*See* Opp. Mem. at 12, 17). Plaintiffs argue, however, that reliance may be presumed and therefore an allegation of individual reliance is unnecessary. Toward that end, plaintiffs argue that "individual customers relied—as Congress intended—on the regulatory system to assure Baron's stability." (*Id.* at 12). In making that argument, plaintiffs draw analogies to the "fraud on the market" theory of claims brought under the federal securities laws.

■■■■■■ The fraud on the market theory rests on

> the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Basic Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Based on this notion of an efficient market, the fraud on the market theory permits "a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market."[8] *Schultz v. Commercial Pro-*

---

8. Although plaintiffs make reference to the fraud on the market theory, their argument bears a stronger resemblance to the "fraud on the regulatory process" discussed by the Court in *In re Towers Financial Corp. Noteholders Litigation*, No. 93 Civ. 0810(WK)(AJP), 1995 WL 571888, at **23–24 (S.D.N.Y. Sept. 20, 1995). The fraud on the regulatory process theory is based on the notion that the "purchaser of an original issue security relies, at least indirectly, on the integrity of the regulatory process and the truth of

gramming Unlimited Inc., No. 91 Civ. 7924(LJF), 1992 WL 396434, at **3–4 (S.D.N.Y. Dec.23, 1992). It is well established that common law fraud cases are distinguishable from cases involving the fraud on the market theory. See In re Motel 6 Securities Litigation, 93 Civ. 2183(JFK), 1997 WL 154011 (S.D.N.Y. Apr. 2, 1997); Turtur v. Rothschild Registry Int'l Inc., No. 92 Civ. 8710, 1993 WL 338205 (S.D.N.Y. Aug.27, 1993); Schultz v. Commercial Programming Unlimited Inc., No. 91 Civ. 7924(LJF), 1992 WL 396434 (S.D.N.Y. Dec.23, 1992). Common law fraud claims must be supported by factual allegations demonstrating a plaintiff's actual, direct reliance on the misrepresentation. See In re Motel 6 Sec. Litig., 1997 WL 154011, at *5; Turtur, 1993 WL 338205, at *8. Plaintiffs make no such allegations here.

■ Although plaintiffs make no reference to the Court of Appeals' decision in Rosen v. Spanierman, 894 F.2d 28 (2d Cir.1990), that decision appears to have greater relevance here than the fraud on the market theory. In Rosen v. Spanierman, the Court of Appeals stated that a "third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants intended the misrepresentations to be conveyed to him." 894 F.2d at 33. In that case, the Court found that plaintiff failed to state a claim of fraud, even though the third party had directly repeated the defendant's misrepresentation to the plaintiff, because of

the absence of detrimental reliance. Fraud claims asserted pursuant to the holding in Rosen v. Spanierman still require a plaintiff to allege that he or she actually relied on the misrepresentations that were made to a third party. See id. at 33–34; Hyosung America, Inc. v. Sumagh Textile Co., Ltd., 25 F.Supp.2d 376, 383–84 (S.D.N.Y.1998). Plaintiffs cannot make such an allegation here because Baron's customers did not receive, read or review any financial statements certified by Seidman; the Complaint only alleges that financial statements were sent to the SEC and NASD. Neither do plaintiffs allege the SEC or NASD directly communicated Seidman's misrepresentations to SIPC or to Baron's customers. In fact, plaintiffs' theory rests on the absence of any activity by the regulators, which allegedly caused Baron's customers to invest more money with Baron, rather than on any subsequent communication of Seidman's misrepresentation.

In the absence of any allegation of reliance on supposed misrepresentations, plaintiffs' claim for fraudulent misrepresentation, or common law fraud, is dismissed.

### C. Negligent Misrepresentation

■ The New York Court of Appeals clearly set forth the limits of accountant liability for negligence to noncontractual parties in Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985).[9] The

---

any representations made to the appropriate agencies and the investors at the time of the original issue." Id. at *24. I decline to apply the fraud on the regulatory process here. First, the Court of Appeals has never recognized this theory. Second, the fraud on the regulatory process has a very limited application. It is limited to purchasers of a security at the time of the original issue. See id. at **23–24. Here, the Complaint does not allege that SIPC or the Baron customers bought shares in Baron; rather, plaintiffs' theory is that Baron was an unsafe vehicle for the customers' investments in other companies. (See Opp.Mem. at 13). Accordingly, the fraud

on the regulatory process theory is inapplicable.

9. In their brief, plaintiffs argued that the applicability of New York law to their negligence claims was uncertain and urged the Court to apply the "foreseeability rule" applied by other jurisdictions. (See Opp.Mem. at 23–25). The strength with which plaintiffs asserted that argument dissipated at oral argument, however, and plaintiffs ultimately conceded that New York law applies to the negligence claims. Additionally, New York law applies because the Complaint itself alleges that "a substantial part of the events and

Court held that a relationship sufficiently approaching privity must be established, and that three criteria must be met. Taken together, they are: (1) the accountant must have been aware that the financial reports were to be used for a particular purpose; (2) in furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to the allegedly relying party, evincing the accountant's understanding of that party's reliance. *Credit Alliance,* 65 N.Y.2d at 551, 493 N.Y.S.2d 435, 483 N.E.2d 110. The criteria ensure that accountants will not be exposed "to a liability in an indeterminate amount for an indeterminate time to an indeterminate party." *Id.* at 548, 493 N.Y.S.2d 435, 483 N.E.2d 110 (quoting *Ultramares Corp. v. Touche,* 255 N.Y. 170, 179–180, 174 N.E. 441 (1931) (Cardozo, J.)).

██ The New York Court of Appeals decision in *Westpac Banking Corp. v. Deschamps,* 66 N.Y.2d 16, 494 N.Y.S.2d 848, 484 N.E.2d 1351 (1985), is instructive. In that case, a bank brought an action for a bad bridge loan made in reliance on financial statements certified by the defendant accountants. There, the complaint alleged that the accountant performed the audit and provided financial statements to raise capital, *i.e.,* a bridge loan, and the accountant knew of that "particular purpose." *See* 66 N.Y.2d 16, 494 N.Y.S.2d at 850, 484 N.E.2d 1351. The complaint alleged that the accountant owed a duty to the entire class of potential bridge lenders and especially the plaintiff, who at the time of certification was the "prime candidate" to provide the loan. *See id.* In applying the second *Credit Alliance* factor, the Court held that the facts alleged were not the equivalent of knowledge of the specific nonprivy party who would be relying on the audit reports. *See id.* Here, plaintiffs also claim that accountants knew that Baron's customers would rely on the financial

statements prepared by Seidman. Such a general assertion does not satisfy the requirement that the accountant have knowledge of "a specific nonprivy party."

Furthermore, plaintiffs have failed to allege sufficient linking conduct by Seidman towards Baron's customers. In general, New York courts have required linking conduct that is much more extensive than the conduct alleged here. *Cf. Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 554, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985) (holding that multiple, direct and substantive communications and personal meetings with the relying customers established a relationship sufficiently approaching privity) *with Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 705, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992) (holding that a "single unsolicited phone call" did not establish linking conduct). There is no allegation that Seidman had any dealings with Baron customers or specifically agreed with Baron to prepare its financial statements for those customers. In addition, as I noted above, the plaintiffs concede that Baron's customers never received or reviewed financial statements certified by Seidman. Such conduct was insufficient to properly allege a claim in *Westpac,* and it similarly fails here.

In general, the policy concerns which animate the regulatory framework of the federal securities laws differ from those policy concerns which infuse the common law of New York. *Credit Alliance* and its progeny stand for the principle that an accountant cannot be liable to the public at large under New York common law, and I decline to diminish that protection even if Seidman failed to satisfy its obligations under a federal statute.

Accordingly, plaintiffs have failed to state a claim for negligent misrepresenta-

---

omissions giving rise to the claims set forth in this complaint occurred [in New York],"

(Complaint ¶ 3), and it identifies no other state in which material events occurred.

tion on behalf of SIPC in its own right or on behalf of Baron's customers.[10]

## CONCLUSION

For the reasons set forth above, the defendant's motion is granted. The Trustee may, within thirty days of the date hereof, plead the existence of a member of Baron's management innocent of the fraud and with the ability to prevent it. Failure to do so will result in the dismissal of the action. The claims asserted by SIPC on its own behalf, as well as the claims asserted by SIPC and the Trustee on behalf of Baron's customers, are dismissed.

SO ORDERED.

10.  Because I hold that plaintiffs have failed to state a claim for which relief can be granted, I need not address defendant's statute of limitations argument.