**SECURITIES INVESTOR PROTECTION CORPORATION, and James W. Giddens, as Trustee for the liquidation of the business of A.R. Baron & Co., Inc., Plaintiffs–Appellants,**

v.

**BDO SEIDMAN, LLP, Defendant–Appellee.**

**Docket Nos. 99–7719, 99–7720.**

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 2000

Decided June 5, 2000

Kenneth J. Caputo (Stephen P. Harbeck, on the brief), Washington, D.C., for plaintiff-appellant Securities Investor Protection Corporation.

James B. Kobak, Jr., Hughes Hubbard & Reed LLP (Daniel H. Weiner, on the brief), New York, NY, for plaintiff-appellant James W. Giddens, as Trustee for the liquidation of the business of A.R. Baron & Co., Inc.

Michael R. Young, Willkie Farr & Gallagher (Jeffrey O. Grossman, Willkie Farr & Gallagher; Scott M. Univer & Barbara A.

Taylor, BDO Seidman, LLP, on the brief), New York, NY, for defendant-appellee BDO Seidman, LLP.

Before: MESKILL and SOTOMAYOR, Circuit Judges, and KEENAN,* District Judge.

## ORDER

Certificate to the New York Court of Appeals pursuant to Local Rule § 0.27 and New York Compilation of Codes, Rules & Regulations, title 22, § 500.17(b).

## OPINION

SOTOMAYOR, Circuit Judge:

Plaintiff-appellants Securities Investor Protection Corporation ("the SIPC") and James W. Giddens ("the Trustee"), as trustee for the liquidation of the business of A.R. Baron & Co., Inc. ("Baron") (collectively, "the plaintiffs"), brought this action against the accounting firm BDO Seidman, LLP ("Seidman"), claiming that Seidman engaged in fraud, negligent misrepresentation, and breach of contract by filing false audit reports on Baron's behalf with the Securities and Exchange Commission ("SEC"). The plaintiffs allege that Seidman's conduct caused financial damage both to Baron's customers, whom the Trustee represents in liquidation and to whose claims the SIPC is subrogated, and to the SIPC in its own right insofar as it has advanced funds to cover the costs of Baron's liquidation. The district court dismissed the plaintiffs' claims, finding that the SIPC lacked standing to sue on its own behalf and that neither the SIPC nor the Trustee could state a claim upon which relief could be granted on behalf of Baron's customers because the customers did not themselves directly rely on Seidman's audit reports. For the reasons that follow, we find that the court erred in concluding the SIPC lacked standing to sue on its own

behalf, but we affirm the district court's dismissal of both the SIPC's and the Trustee's claims on behalf of Baron's customers. With respect to the claims the SIPC brings on its own behalf, we certify to the New York Court of Appeals the question of whether the SIPC may recover damages where Seidman was aware that the SIPC would receive from the SEC any negative information about Baron's financial condition contained in the audit reports, but never provided those reports directly to the SIPC or engaged in more than minimal direct contact with it.

## BACKGROUND

### I. The Securities Investor Protection Act

The SIPC is a private, nonprofit membership corporation formed pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 84 Stat. 1636, as amended, 15 U.S.C. §§ 78aaa–78*lll.* Congress passed the SIPA in response to a rash of failures among securities broker-dealers in the late 1960s, resulting in significant losses to customers whose assets either were unrecoverable or became tied up in the broker-dealers' bankruptcy proceedings. *See Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 413, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). To prevent further losses, restore confidence in the securities industry, and provide protection for future customers, Congress created the SIPC, which monitors the activities of broker-dealers and insures customers in the case of a broker-dealer's liquidation. *See* 15 U.S.C. § 78ccc. To cover these costs, the SIPC maintains a fund ("the SIPC Fund"), which is supported by assessments on members' revenues. *See id.* § 78ddd(c). Virtually all registered broker-dealers doing business in the United States must belong to the SIPC. *See id.* § 78ccc(a)(2).

The SIPA regulatory scheme imposes two primary duties on the SIPC: monitor-

---

* The Honorable John F. Keenan, of the United States District Court for the Southern District of New York, sitting by designation.

ing active broker-dealers and overseeing the liquidation of failed firms. In order to monitor broker-dealers and ensure their continuing financial viability, the SIPC relies primarily on the SIPA reporting system, which requires broker-dealers to file annual audit reports with the SEC and with one of several self-regulating bodies within the broker-dealer industry. *See* 17 C.F.R.§ 240.17a ("Rule 17a"). These reports must include, *inter alia,* an analysis of the broker-dealer's compliance with the "net capital rule," which prohibits a broker-dealer from maintaining an aggregate debt greater than 1500% of its net capital, *see id.* § 240.15c3–1, and other information regarding the broker-dealer's financial condition. Rule 17a requires broker-dealers to employ an independent public accountant to file these reports. *See id.* § 240.17a–5. If the information provided to the SEC and the industry self-regulating body indicates that a broker-dealer is approaching financial difficulty, those entities must notify the SIPC, which, if it deems the broker-dealer to be in danger of failure, may choose to commence liquidation proceedings. *See Barbour,* 421 U.S. at 416–17, 95 S.Ct. 1733. This elaborate reporting scheme is designed to serve as an "early warning" system that will "enable [regulatory authorities] to take appropriate action to protect investors" before a broker-dealer collapses. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 570, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

To initiate liquidation, the SIPC may apply for a "protective decree" in federal district court invoking the protections of the SIPA. *See* 15 U.S.C. § 78eee(a)(3). If the court finds grounds for granting the application, it must appoint a trustee, chosen by the SIPC, to oversee the liquidation of the business. *See id.* § 78eee(b)(3). The trustee exercises the same powers that a bankruptcy trustee exercises with respect to a debtor, including the power to distribute customer property, satisfy cus-

tomer claims, and liquidate the broker-dealer's business. *See id.* §§ 78fff(a), 78fff–1(a). To ensure prompt settlement of customer claims during liquidation, the SIPC may advance funds to the trustee from the SIPC Fund for use in satisfying claims up to $500,000 per customer [1] and for administrative costs of the liquidation. *See id.* § 78fff–3(a)(1). Under the terms of the SIPA, the SIPC becomes subrogated to customer claims to the extent it has advanced funds to cover those claims. *See id.* §§ 78fff–3(a), 78fff–4(c).

## II. *The events in this case*

Pursuant to the SIPA, Seidman served as the independent certified public accountant and auditor for Baron, a registered securities broker-dealer, from 1992 through 1995. During that time, several members of Baron's management—known as the "Bressman Team," after Baron's Chief Executive Officer Andrew Bressman—engaged in several illegal activities, including, according to the plaintiffs' complaint, fraud in the sale of securities, manipulation of initial public offerings and after-market trading, and personal use of corporate credit. Ultimately, thirteen Baron employees pleaded guilty to or were convicted of criminal wrongdoing and Baron itself pleaded guilty to one count of enterprise corruption.

Baron filed for bankruptcy in 1996. On July 11, 1996, the United States District Court for the Southern District of New York (Preska, J.) entered an order finding, *inter alia,* that Baron's customers were in need of the protections of the SIPA and directing the appointment of the Trustee to oversee Baron's liquidation. *See Securities Investor Protection Corp. v. Baron & Co.,* No. 99 Civ. 5171 (S.D.N.Y. July 11, 1996). Since that time, the Trustee has disbursed over $2.5 million to customers and creditors, and the SIPC has advanced over $5.5 million to cover customer claims and administrative costs of the liquidation.

---

**1.** With respect to a customer's cash on deposit with a broker-dealer, the SIPC is not obli-

gated to advance more than $100,000 per customer. *See* 15 U.S.C. § 78fff–3(a)(1).

The Trustee and the SIPC brought this action against Seidman in 1998, alleging that Seidman's deficient performance as Baron's certified public accountant permitted the Bressman Team's misconduct to continue undetected and that, as a result, neither the customers nor the SIPC were aware of Baron's precarious financial condition until shortly before the firm's collapse. Specifically, the plaintiffs claim, *inter alia,* that Seidman failed to follow proper audit procedures, failed to comply with SEC rules and regulations, and neglected to disclose Baron's inadequate internal fraud controls. They also allege that Seidman misrepresented Baron's financial condition in its audit reports to the SEC and to the National Association of Securities Dealers ("NASD"), the relevant industry self-regulating body for Baron. The Trustee sues on behalf of Baron's customers, both as bailee of the fund of customer property held by Baron prior to liquidation and as subrogee of the customers whose net equity claims it has paid. The SIPC sues both on its own behalf and as subrogee to the claims of the customers whose net equity claims it has satisfied through the SIPC Fund.

On June 4, 1998, Seidman moved to dismiss the plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), claiming that the plaintiffs lacked standing and that the complaint failed to state a claim upon which relief could be granted. In an opinion dated May 14, 1999, the United States District Court for the Southern District of New York (Preska, J.) granted the defendant's motion to dismiss. The court found that both the Trustee and the SIPC had standing to sue as subrogee of Baron's customers' claims, but that the SIPC had no authority to bring an action on its own behalf. *See Securities Investor*

*Protection Corp. v. BDO Seidman, LLP,* 49 F.Supp.2d 644, 653–54 (S.D.N.Y.1999). On Seidman's Rule 12(b)(6) claim, the court found that the plaintiffs could not state a cause of action for either fraudulent misrepresentation or negligent misrepresentation because they had not alleged that Baron's customers ever received or read Seidman's financial reports. *See id.* at 656–57. The court thus held that, under New York law, the plaintiffs could not establish either the reliance on the misrepresentations necessary to prevail on a fraud claim, *see id.* at 656, or the privity-like relationship between Seidman and the customers required for a negligent misrepresentation claim, *see id.* at 657.[2]

## DISCUSSION

■■■ We review *de novo* a district court's dismissal pursuant to Rules 12(b)(1) and 12(b)(6), taking all facts alleged in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *See Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir. 1997). Dismissal under these rules is inappropriate "unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (citations and internal quotation marks omitted).

### I. *Standing*

#### A. *The SIPC*

The SIPC asserts standing in two capacities: 1) as subrogee to the customer claims it has paid through the SIPC Fund; and 2) in its own right, for losses sustained through satisfying the customer claims and

---

2. The district court analyzed the plaintiffs' breach of contract claim under the heading of the fraud and negligence claims, finding that the plaintiffs' various allegations against Seidman "constitute 'a single form of wrongdoing under different names'" and that, in essence, the complaint in this case "[seeks] to recover for [Seidman's] negligent and fraudulent mis-

representations." *See Seidman,* 49 F.Supp.2d at 654–55 (quoting *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 453 (7th Cir.1982)). On appeal, the plaintiffs argue only the fraud and negligent misrepresentation claims and do not attempt to assert a separate claim for breach of contract.

for unreimbursed administrative expenses. The district court found that the SIPC had standing only in the former capacity, as subrogee to Baron's customers' claims. *See Seidman,* 49 F.Supp.2d at 653–54. We disagree and hold that the SIPC has the power to sue both as subrogee of Baron's customers and on its own behalf.

### 1. *Standing as subrogee*

The SIPC's standing as the subrogee to the claims of Baron's customers rests on our holding in *Redington v. Touche Ross & Co.,* 592 F.2d 617 (2d Cir.1978), *rev'd and remanded on other grounds,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). In *Redington,* we relied on principles of insurance law to hold that the SIPC, as subrogee of the customers of a failed broker-dealer, enjoyed a "general common-law right of equitable subrogation." *Id.* at 624. Specifically, we noted that at common law, an insurer may be subrogated "to any right of action which the insured may have against a third person whose negligence or wrongful act caused the loss," and that nothing in the SIPA exempted the SIPC from this general rule. *Id.* (quoting 31 N.Y. Jur., Insurance § 1620, at 510). Furthermore, we found inconsistent with the Congressional intent underlying the SIPA the notion that wrongdoers should receive the "windfall" that would result if the SIPC were unable to recover its insurance payments from the parties ultimately responsible for the customers' losses. Based on these principles of subrogation, we held that the SIPC, as subrogee, had the power to sue a broker-dealer's accountant for filing false or misleading reports pursuant to the audit requirements of Rule 17a. *See id.*

The district court in this case determined that it was bound by our decision in *Redington* to find that the SIPC had standing to pursue claims on behalf of customers. In so holding, the district court questioned the wisdom of the *Redington* decision, *see Seidman,* 49 F.Supp.2d at 653–55, and on appeal Seidman urges us to overturn that case and find that the SIPC has no standing as the customers' subrogee to assert claims against third parties. Even if we were justified in revisiting the *Redington* decision, however, *see In re Sokolowski,* 205 F.3d 532, 534–35 (2d Cir.2000) ("This court is bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court en banc.") (citations and internal quotation marks omitted), we need not do so in this case, as we hold that the SIPC's claims on behalf of Baron's customers fail under Rule 12(b)(6). *See infra* Part II. We therefore assume, without deciding, that the SIPC has standing as the customers' subrogee, but find that the district court was correct in dismissing its claims on substantive grounds.

### 2. *Standing to sue on its own behalf*

■ In addition to bringing suit as subrogee of Baron's customers, the SIPC argues that the plain language of the SIPA permits the SIPC to sue in its own right for any losses it may have suffered as a result of Seidman's misconduct. We agree.

The SIPA endows the SIPC with "the power to sue and be sued, complain and defend, in its corporate name and through its own counsel, in any State, Federal, or other court." 15 U.S.C. § 78ccc(b)(1). The Act also provides that the SIPC, as a nonprofit corporation, shall "have all the powers conferred upon a nonprofit corporation by[ ] the District of Columbia Nonprofit Corporation Act." *Id.* § 78ccc(a)(1)(B). The D.C. Nonprofit Corporation Act grants nonprofit corporations the power "[t]o sue and be sued." D.C.Code Ann. § 29–505(2) (1981). The plain language of these statutes clearly contemplates that the SIPC, like any nonprofit corporation, will have the power to pursue actions on its own behalf.

Caselaw involving similar government-created corporations supports this reading of the SIPA. In *Resolution Trust Corpora-*

*tion v. Coopers & Lybrand*, 915 F.Supp. 584 (S.D.N.Y.1996), for example, the district court granted standing to the Resolution Trust Corporation ("RTC") based on 1) the "express terms of the [enabling] statute," which granted the power "to sue and be sued"; 2) Congress's intent that the RTC—or its predecessor, the Federal Savings and Loan Insurance Corporation ("FSLIC")—have the power to act "in a manner similar to a private corporation," coupled with the fact that private corporate bodies have "the inherent power to bring claims against tortfeasors"; and 3) the conclusion that "common sense dictates that the FSLIC had the ability to bring a negligence action." *Id.* at 590. Moreover, other cases have suggested that the Federal Deposit Insurance Corporation ("FDIC"), whose enabling legislation, *see* 12 U.S.C. § 1819(a), parallels that of the RTC and the SIPC, has standing to sue on its own behalf. *See Federal Deposit Ins. Corp. v. Ernst & Young*, 967 F.2d 166, 169 (5th Cir.1992) (assuming, without deciding, that the FDIC has the power to sue in its own right); *Federal Deposit Ins. Corp. v. Cheng*, 832 F.Supp. 181, 186 (N.D.Tex.1993) (same); *see also id.* at 187 n. 2 (observing that "[t]he regulatory roles of the FDIC, FSLIC, and RTC are sufficiently similar that case-law analysis is substantially interchangeable") (citation omitted). While the statutory and regulatory scheme of the SIPC is not identical to that of the RTC or the FDIC, the three entities rest on substantially similar enabling legislation and, as nonprofit government corporations, share similar features. *Compare* 12 U.S.C. § 1811 *et seq.* (delineating the powers and responsibilities of the FDIC); 12 U.S.C. § 1441(b) (establishing the RTC); *Coopers & Lybrand*, 915 F.Supp. at 589 (discussing RTC's powers as successor to the FSLIC) (quoting 12 U.S.C. § 1725 (repealed 1989)) *with* 15 U.S.C. § 78ccc *et seq.* (listing the powers and duties of the SIPC). Insofar as the RTC and FDIC have the power to bring fraud and negligence claims, therefore, we find that the SIPC enjoys this authority as well.

Seidman attempts to defeat this reading of the SIPA by relying on 15 U.S.C. § 78ddd, the provision that delineates the authority and operations of the SIPC Fund. Section 78ddd enumerates several ways the SIPC may generate revenue, including assessments on its members, borrowing, and obtaining loans from the SEC. *See id.* Seidman, invoking the *expressio unius est exclusio alterius* canon of statutory construction, argues that because this provision does not include the authority to sue independently to recover funds paid out in the course of its duties, Congress did not intend to grant the SIPC the ability to recover damages in a civil action.

We reject this contention. Section 78ddd addresses methods by which the SIPC may obtain revenue in the ordinary course of its business; recovery of damages does not fall within this category, but rather constitutes a process for redressing injuries resulting from another's misconduct. Damages, in short, are not ordinary revenue. That § 78ddd does not include the ability to sue for damages as a method of obtaining funds, therefore, does not suggest that Congress intended to deprive the SIPC of that power. *Cf. United States v. Mango*, 199 F.3d 85, 90 (2d Cir.1999) (noting, in the context of delegation of powers to government officials, that "[the] maxim [*expressio unius*] is not always a reliable guide because Congress may mention a specific official only to make it clear that this official has a particular power *rather than to exclude delegation to other officials*") (emphasis added).

We also reject the district court's conclusion that the SIPC lacked standing because its claim of injury was "primarily based on a theory of subrogation to customer claims." *Seidman*, 49 F.Supp.2d at 653. The SIPC's alleged damages stem not only from the money it has advanced to pay the claims of Baron's customers, but also from the administrative expenses it has incurred to cover Baron's liqui-

dation. Under the SIPA, the SIPC Fund is liable for such administrative expenses to the extent that the debtor is unable to provide reimbursement. *See* 15 U.S.C. § 78fff–3(b)(2). The SIPC alleges that these costs are directly traceable to Seidman, arguing that absent Seidman's misconduct, Baron's liquidation would not have been necessary. *See* Compl. para. 49. Assuming, as we must, that the SIPC can prove this claim, its power to recover administrative costs is unrelated to its status as subrogee to customer claims. We therefore find that the SIPC may sue not only as subrogee of Baron's customers, but on its own behalf to recover any losses for which Seidman may be responsible.

### B. *The Trustee*

As with the SIPC's claims as a subrogee, the district court found that it was bound by *Redington* to find that the Trustee has standing to assert claims on behalf of Baron's customers. *See supra* I.A.1; *Seidman,* 49 F.Supp.2d at 654. Under *Redington,* a trustee in a broker-dealer liquidation proceeding has the power to bring suit against "any wrongdoer whom [the customers] could sue themselves." *Redington,* 592 F.2d at 625. In so holding, we reasoned that an SIPA trustee acts as a bailee of the customers' property, and, in an effort to "marshal[ ] and return[ ]" that property, may sue any third party responsible for the customers' losses. *See id.* (citing Fed.R.Civ.P. 17(a)'s provision that "a … bailee … may sue in his own name without joining with him the party for whose benefit the action is brought").

As with the issue of the SIPC's standing, *see supra* I.A.1, Seidman argues that *Redington* wrongly decided the question of an SIPA trustee's ability to sue third parties, and urges us to review that issue here. Like the SIPC question, however, the issue of the Trustee's standing is not crucial to this appeal, because we find that

the Trustee's claims on behalf of Baron's customers fail in any event under Rule 12(b)(6). *See infra* Part II. Accordingly, we assume without deciding that the Trustee has standing to sue Seidman on customers' behalf in this case, and proceed to consider its claims on the merits.

### II. *The Trustee's claims and the SIPC's claims on behalf of Baron's customers*

Because both the Trustee and the SIPC in their capacities as subrogees assert claims on behalf of Baron's customers, the claims can survive dismissal only if the customers would have had a cause of action against Seidman for either fraudulent or negligent misrepresentation. The district court found that the plaintiffs were unable to meet this requirement with respect to their fraud claim because they could not show that Baron's customers had ever relied on Seidman's alleged misrepresentations. It further found that the plaintiffs' negligence claim failed because they had not established any privity-like relationship between the customers and the defendant. We agree with both conclusions and affirm the district court's dismissal of these claims.

### A. *Fraudulent misrepresentation*

■ Under New York law,[3] a plaintiff may state a claim for fraudulent misrepresentation made to a third party if he alleges that he relied to his detriment on the defendant's misrepresentation and that the defendant intended the misrepresentation to be conveyed to him. *See Rosen v. Spanierman,* 894 F.2d 28, 33 (2d Cir.1990); *Peerless Mills, Inc. v. AT & T,* 527 F.2d 445, 450 (2d Cir.1975); *Ultramares Corp. v. Touche,* 255 N.Y. 170, 187, 174 N.E. 441 (1931). In this case, the plaintiffs argue that they may recover, on the customers' behalf, for misrepresentations contained in the financial statements that Seidman submitted to the SEC and the NASD.

**3.** The parties do not dispute that New York law applies to the plaintiffs' fraud and negligent misrepresentation claims.

■ The district court correctly rejected this claim. Crucially, the plaintiffs concede that Baron's customers never received or reviewed any of the financial statements certified by Seidman. *See Seidman,* 49 F.Supp.2d at 655. Moreover, the plaintiffs do not allege that the SEC or the NASD ever conveyed the information contained in those statements to the customers, nor do they allege that they were entitled to receive any materials or information prepared for purposes of complying with the SIPA.[4] Because Baron's customers never received Seidman's alleged misrepresentations in any form, therefore, the plaintiffs cannot establish that the customers relied to their detriment on that misinformation.

The plaintiffs here argue, however, that they need not establish direct reliance by Baron's customers on Seidman's representations. Rather, they contend that they are entitled to a presumption of reliance because the customers depended on the regulatory process as a whole to ensure that Baron's financial condition was stable. In making this claim, the plaintiffs rely on a theory of "fraud on the regulatory process," an extension of the "fraud on the market" theory applicable in the federal securities context.[5] Fraud on the regulatory process rests on the notion that in making investment decisions, an investor "relies, at least indirectly, on the integrity

of the regulatory process and the truth of any representations made to the appropriate agencies and the investors." *In re Towers Fin. Corp. Noteholders Litig.,* No. 93 Civ. 0810, 1995 WL 571888, at *23 (S.D.N.Y. Sept. 20, 1995); *see also Mishkin v. Peat, Marwick, Mitchell & Co.,* 658 F.Supp. 271, 274–75 (S.D.N.Y.1987) (Weinfeld, J.) (applying fraud on the regulatory process theory to presume reliance by a securities broker-dealer's investors). The plaintiffs argue that the fraud on the regulatory process theory should give rise to a presumption of reliance in this case because Baron's customers, when deciding to invest with Baron, relied on the SIPA broker-dealer regulation scheme to alert them of any impending financial difficulties with the firm. *Cf. Mishkin,* 658 F.Supp. at 276 ("An investor does and should be able to rely on the regulatory process' regulation of a broker-dealer to assure the broker-dealer's solvency and legitimacy...."). Because Seidman made misrepresentations in its reports to regulators, however, the process was unable to monitor Baron properly, causing customers to lose their investments when the alleged fraud came to light.

■ Whatever the merits of the "fraud on the regulatory process" theory—which the Second Circuit has never recognized,

---

4. Indeed, Seidman's audit reports expressly stated that certain portions would be kept confidential pursuant to Rule 17a–5(e)(3), which permits a broker-dealer to withhold its "Statement of Financial Condition" from customers, *see* 17 C.F.R. § 240.17a–5(e)(3).

5. According to the "fraud on the market" theory, a plaintiff claiming securities fraud under § 10b of the Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U.S.C. § 78a *et seq.,* and SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.17b–5, is entitled to a rebuttable presumption of reliance based on the notion that "in an open and developed securities market, the price of a company's stock is determined by the available material information." *Basic Inc. v. Levinson,* 485 U.S. 224, 241, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (internal quotation marks omitted). Consequently, "[m]isleading state-

ments will ... defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* at 241–42, 108 S.Ct. 978.

The plaintiffs invoke fraud on the market as well as fraud on the regulatory process to argue for a presumption of reliance in this case. The fraud on the market concept, however, is inapposite here, because the conduct at issue does not involve the pricing or purchase of securities and the plaintiffs thus cannot show that the customers relied on the integrity of the market itself in deciding to invest with Baron. Accordingly, we agree with the district court that the plaintiffs' claims rely primarily on a fraud on the regulatory process argument, *see Seidman,* 49 F.Supp.2d at 655 n. 8, and analyze the claim under only that theory.

*see Seidman,* 49 F.Supp.2d at 655 n. 8; *In re Towers,* 1995 WL 571888, at \*23—it does not assist the plaintiffs in this case. To the extent that the federal courts have adopted this concept, it has applied only in the context of the federal securities laws. *See Arthur Young & Co. v. United States District Court,* 549 F.2d 686, 695 (9th Cir. 1977); *Mishkin,* 658 F.Supp. at 274. As the district court recognized, common-law fraud claims require a different analysis than those brought under the federal securities regulation scheme. *See Basic Inc. v. Levinson,* 485 U.S. 224, 244 n. 22, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Actions under Rule 10b–5 are distinct from common-law deceit and misrepresentation claims and are in part designed to add to the protections provided investors by the common law.") (citations omitted). Relying on this distinction, federal courts repeatedly have refused to apply the fraud on the market theory to state common law cases despite its wide acceptance in the federal securities fraud context. *See In re Motel 6 Sec. Litig.,* 93 Civ. 2183, 1997 WL 154011, at \*6 (S.D.N.Y. Apr.2, 1997); *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1221 (S.D.N.Y.1994), *aff'd,* 57 F.3d 146 (2d Cir.1995); *Turtur v. Rothschild Registry Int'l Inc.,* No. 92 Civ. 8710, 1993 WL 338205, at \*7 (S.D.N.Y. Aug.27, 1993); *Schultz v. Commercial Programming Unlimited Inc.,* No. 91 Civ. 7924, 1992 WL 396434, at \*4 (S.D.N.Y. Dec.23, 1992). New York courts have also recognized this difference. *See Strauss v. Long Island Sports, Inc.,* 60 A.D.2d 501, 401 N.Y.S.2d 233, 237 (2d Dep't 1978) ("Other 10b–5 cases . . . do dispense with a showing of reliance provided the misrepresentation is material. But it appears from these decisions that 10b–5 cases are very much distinguishable from common-law fraud cases."); *Stellema v. Vantage Press Inc.,* 121 Misc.2d 1058, 470 N.Y.S.2d 507, 510 (Sup.Ct.1983) ("While reliance need not be proved in [a Rule 10b–5] case, the requirement of a showing of reliance has not been removed in common-law fraud cases. . . .").

Given that New York has not adopted even the well-recognized fraud on the market theory to allow a presumption of reliance in common-law fraud cases, we see no basis for applying the fraud on the regulatory process theory to achieve that end in this state-law case. Contrary to the plaintiffs' contention, therefore, we will not presume that Baron's customers relied on Seidman's misrepresentations. Rather, the plaintiffs must show that the customers "actually relied" on Seidman's certified statements to the SEC and the NASD regarding Baron's financial health. *See Rosen,* 894 F.2d at 34. Because the plaintiffs' complaints are devoid of any allegation that Baron's customers ever received this information in any form, they cannot establish reliance under New York law. *Cf. Strauss,* 401 N.Y.S.2d at 235–36 (finding no class-wide reliance in fraud class action because the plaintiffs could not establish that every class member had seen the alleged misrepresentations). We thus affirm the dismissal of the plaintiffs' claim for fraudulent misrepresentation.

### B. *Negligent misrepresentation*

In New York, a plaintiff claiming negligent misrepresentation against an accountant with whom he has no contractual relationship faces a heavy burden. To prevail, the plaintiff must establish three elements: 1) the accountant must have been aware that the reports would be used for a particular purpose; 2) in furtherance of which a known party was intended to rely; and 3) some conduct by the accountant "linking" him or her to that known party. *See Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). The New York Court of Appeals has described these three factors as establishing a relationship "approach[ing] that of privity" between the accountant and the third party claiming negligence. *Id.* at 550, 493 N.Y.S.2d 435, 483 N.E.2d 110 (quoting *Ul-*

*tramares,* 255 N.Y. at 182–83, 174 N.E. 441). This strict limitation on the class of potential plaintiffs represents a policy determination by the New York courts that accountants will not, merely by contracting with a particular client, expose themselves "to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares,* 255 N.Y. at 179, 174 N.E. 441.

Like the district court, we find that the plaintiffs have failed to satisfy both the second and third elements of the *Credit Alliance* test.[6] *See Seidman,* 49 F.Supp.2d at 657. We consequently affirm the district court's dismissal of the plaintiffs' negligence claims on behalf of Baron's customers.

### 1. "Known party"

◼ To qualify as "known parties" under New York law, plaintiffs must be members of "a known group possessed of vested rights, marked by a definable limit and made up of certain components." *White v. Guarente,* 43 N.Y.2d 356, 361, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977). Applying this standard, the New York Court of Appeals in *White* deemed the plaintiff a known party because the defendant accounting firm knew, when it agreed to perform an audit, that a group of limited partners, including the plaintiff, would rely on that audit in preparing their tax returns. *See id.* Because the plaintiff thus was part of an identifiable, particularized group rather than "a faceless or unresolved class of persons," the court found that the accountant owed him a duty of care with respect to services performed for purposes of that group's reliance. *See id.* at 361, 363, 401 N.Y.S.2d 474, 372 N.E.2d 315; *see also Duke v. Touche Ross & Co.,* 765 F.Supp. 69, 77 (S.D.N.Y.1991) (granting known-party status under New York law where the accountant's report was dis-

seminated to "a select group of qualified investors").

By contrast, absent some evidence that he or she comprises part of such a specific class, a plaintiff generally will be unable to satisfy the "known party" requirement. In *Westpac Banking Corp. v. Deschamps,* 66 N.Y.2d 16, 494 N.Y.S.2d 848, 484 N.E.2d 1351 (1985), for example, the Court of Appeals found that the plaintiff, a creditor, could not maintain a negligence action against an accountant for a false audit report prepared on behalf of the debtor, even though the plaintiff had relied on that report in agreeing to extend credit. The court noted that the accountant had not prepared the report specifically for the plaintiff, but rather for the debtor for the purpose of supplying it generally to creditors in an attempt to obtain a loan. Because the plaintiff thus was only "one of a class of 'potential ... lenders,' " it could not qualify as a specific, known party for purposes of a negligence action. *See id.* at 19, 494 N.Y.S.2d 848, 484 N.E.2d 1351. Similarly, in *Ultramares,* a seminal New York case on accountant negligence, the court declined to hold the accountant liable where the plaintiff, a creditor, was merely one of "the indeterminate class of persons who, presently or in the future, might deal with [the debtor] in reliance on the audit." 255 N.Y. at 183, 174 N.E. 441; *see also Security Pacific Bus. Credit, Inc. v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 708, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992), (finding no third-party negligence claim where the accountant's audit work "was clearly for the benefit of its client ... and 'only incidentally or collaterally for the use of those to whom [the client] might exhibit it thereafter.' ") (quoting *Ultramares,* 255 N.Y. at 183, 174 N.E. 441).

◼ These cases strongly resemble the one before us. In this case, the plaintiffs do not allege that Seidman prepared its

---

**6.** The district court did not address whether the plaintiffs had satisfied the first element of their negligence claim by alleging that Seidman prepared its audits for a "particular pur-

pose." Because we find that the plaintiffs' claim fails to meet the second and third *Credit Alliance* factors, we need not reach this issue on appeal.

audit reports for Baron's customers; rather, Seidman prepared those statements for filing with the SEC and the NASD, as required under the SIPA. Even if Baron's customers relied indirectly on the material contained in those reports—specifically, information indicating that Baron was financially healthy—in deciding to invest or maintain accounts with Baron, the complaint does not allege that Seidman ever knew those investors' identities, or even of the number of customers Baron had at any one time. At best, therefore, the plaintiffs can establish that Baron's customers constitute an unknown class of investors, each of whom potentially would rely on Seidman's representations. These circumstances are insufficient to render the customers "known parties" under New York law.

 The plaintiffs nonetheless urge this Court to find that Baron's customers meet this requirement on the ground that any accountant knows, when contracting for services with a broker-dealer, that customers will rely on its audit reports to ensure the financial viability of the dealers with whom they invest. *See Redington,* 592 F.2d at 623 ("[S]ection 17 imposes a duty on accountants in favor of brokers' customers.... [T]he broker's customers must rely on the certification by the accountants."); *Mishkin,* 658 F.Supp. at 275 ("[A]n accountant engaged in [auditing] activities can reasonably foresee that not only the regulatory agency but also the purchasing public will rely upon the audit."). We reject this contention. Under New York law, the mere knowledge that some customers will rely on an accountant's work does not establish negligence liability. Rather, the accountant must have known when preparing the audit that the *particular plaintiffs* bringing the action would rely on its representations. *See Westpac,* 66 N.Y.2d at 19, 494 N.Y.S.2d 848, 484 N.E.2d 1351 (noting that plaintiff's status as a "prime candidate" for a loan "is not ... the equivalent of knowledge of 'the identity of the specific nonpri-

vy party who would be relying upon the audit reports' ") (quoting *Credit Alliance,* 65 N.Y.2d at 554, 493 N.Y.S.2d 435, 483 N.E.2d 110). Because the plaintiffs here have not alleged that Seidman knew of any particular customers who would rely on its work for Baron, they have not satisfied the "known party" element of their negligent misrepresentation claim.

### 2. "Linking conduct"

 The plaintiffs also fail to allege "linking conduct" between Seidman and Baron's customers sufficient to impose negligence liability on Seidman. To demonstrate linking conduct, a plaintiff generally must show some form of direct contact between the accountant and the plaintiff, such as a face-to-face conversation, the sharing of documents, or other "substantive communication" between the parties. *See, e.g., Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 385, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992) (finding linking conduct where accountant sent its financial opinion letter directly to the plaintiff); *Credit Alliance,* 65 N.Y.2d at 554, 493 N.Y.S.2d 435, 483 N.E.2d 110 (finding linking conduct where the parties communicated repeatedly to discuss the financial situation of the entity being audited).

Where direct contact between the accountant and the plaintiff has been nonexistent or even minimal, however, the plaintiff cannot recover for negligence. In *Security Pacific,* for example, the New York Court of Appeals found linking conduct absent because the accountant had never provided or agreed to provide a copy of the audit report directly to the plaintiff, had not mentioned the plaintiff in its audit engagement letter with its client, and had shown no awareness that the audit would benefit primarily the plaintiff. *See Security Pacific,* 79 N.Y.2d at 706, 586 N.Y.S.2d 87, 597 N.E.2d 1080. The court noted that the plaintiff, a lender, did in fact speak to the accountant by telephone on one occasion to discuss the audit

report. Nonetheless, the court found this contact insufficient to establish liability, reasoning that the plaintiff could not, with one phone call, "create such an extraordinary obligation" on the defendant's part. *Id.* at 705, 586 N.Y.S.2d 87, 597 N.E.2d 1080; *see also CMNY Capital, L.P. v. Deloitte & Touche,* 821 F.Supp. 152, 161 (S.D.N.Y.1993) (finding no linking conduct where the accountant's client had made one phone call informing the accountant that the plaintiffs, investors in the client corporation, would be relying on the audit report); *cf. Westpac,* 66 N.Y.2d at 19, 494 N.Y.S.2d 848, 484 N.E.2d 1351 ("[T]here is simply no allegation of any word or action on the part of the accountants directed to [the plaintiff, a lender], or anything contained in [the accountants'] retainer agreement ... which provided the necessary link between them.").

■ Given this high standard for establishing linking conduct, we have little difficulty concluding that the plaintiffs have not shown such a link between Seidman and Baron's customers. The complaint in this case alleges no direct contact whatsoever between the customers and the defendant. At best, it alleges contact between Seidman and the SIPC regulators, who themselves operate at least one step removed from Baron's investors. The plaintiffs therefore cannot establish the direct nexus necessary to give the customers—or, by extension, the SIPC and the Trustee suing on their behalf—a cause of action against Seidman for negligent misrepresentation.[7]

## III. *The SIPC's claims on its own behalf*

■ Having affirmed the district court's dismissal of all claims on behalf of Baron's customers, we now consider the SIPC's claims for losses sustained in its own right. The success or failure of the SIPC's fraud claim depends on the precise extent of New York's reliance requirement, specifically whether the SIPC can establish reliance on Seidman's audit reports despite never having received or read those reports. Similarly, the SIPC's negligence claim turns on the stringency of the known party and linking conduct requirements under New York law. To assess this claim, we must determine: 1) whether the SIPC qualifies as a "known party" for purposes of negligence liability; and 2) whether the SIPC can show "linking conduct" despite its lack of any substantial direct contact with Seidman. Because New York caselaw indicates some uncertainty as to the contours of these limitations on liability, and because resolution of these issues requires a delicate balancing of state policy concerns, we certify these questions to the New York Court of Appeals. *See Joblon v. Solow,* 135 F.3d 261, 264 (2d Cir.1998) (finding certification appropriate where "the state court decisions do not yield a clear answer" and the state has an interest in deciding the question itself "rather than having [it] decided by a federal court, which may be mistaken") (quoting *Home Ins. Co. v. American Home Prods. Corp.,* 873 F.2d 520, 522 (2d Cir.1989)).

### A. *Fraudulent misrepresentation*

As noted above, *see supra* II.A, to recover in New York for misrepresentations made to a third party, the plaintiff must establish that he or she relied to his or her detriment on the misrepresentations and that the defendant intended those misrepresentations to be communicated to the

---

7. We note that in *Redington v. Touche Ross & Co.,* Index No. 13996/76 (N.Y.Sup.Ct. Aug. 3, 1981), the New York Supreme Court allowed a negligence action against an accountant by a broker-dealer's trustee, suing on behalf of customers, despite a lack of specific allegations of linking conduct. The New York Supreme Court decided *Redington* in 1981, how-

ever, four years before the Court of Appeals decided *Credit Alliance.* In light of *Credit Alliance's* requirement that the plaintiff establish some direct nexus with the defendant, and of the narrow reading of that requirement employed in subsequent cases, *Redington* does not support a finding of liability here.

plaintiff. *See Rosen,* 894 F.2d at 33; *Ultramares,* 255 N.Y. at 187, 174 N.E. 441.

Although it dismissed the SIPC's claims on its own behalf for lack of standing, the district court also observed that the SIPC's fraud claim on its own behalf suffered from the same defect as its fraud claim on behalf of Baron's customers: the SIPC could not prove reliance because it could not show that it had ever read any of Seidman's allegedly false financial statements. *See Seidman,* 49 F.Supp.2d at 653 n. 4. As the district court noted, the SIPC alleges that Seidman sent its financial reports to the SEC and the NASD, the industry self-regulating body for Baron, but it does not claim that the SIPC itself received those materials. *See id.* at 656. In response, the SIPC argues that it relied nonetheless on the information contained in Seidman's reports because, under the SIPA regulatory scheme, it relies on the SEC and the NASD to alert it regarding any impending financial difficulties a broker-dealer may be facing. Thus, the SIPC maintains, by remaining silent about a particular broker-dealer's financial condition, the SEC and the NASD essentially transmit the audit report's message that the government has no cause for concern.

This "no news is good news" theory of reliance finds some support in New York law. Analyzing the reliance element in third-party fraud cases, several decisions have suggested that a plaintiff may demonstrate reliance where the third party does not directly repeat the defendant's misrepresentations to the plaintiff, but rather communicates them in a repackaged or summary form, on which the plaintiff then relied. In *Tindle v. Birkett,* 171 N.Y. 520, 64 N.E. 210 (1902), for example, the New York Court of Appeals permitted recovery for misrepresentations made by the defendants to a credit rating agency for purposes of receiving a favorable rating. The plaintiffs never received those misrepresentations directly, but rather relied on the favorable credit rating the agency had formulated using the defendants' misinfor-

mation. *See id.* at 522–23, 64 N.E. 210. The Court of Appeals found that because the plaintiffs extended credit to the defendants "in reliance on the correctness of the rating, without any other knowledge [of the defendant's financial situation]," they had established the reliance necessary to sustain a fraud claim against the defendant. *Id.* at 523, 64 N.E. 210. More recently, in *Caramante v. Barton,* 114 A.D.2d 680, 494 N.Y.S.2d 498 (3d Dep't 1985), the Appellate Division found reliance where the defendant homeowners fraudulently certified to the bank that their septic system was in working order, the bank extended .credit based on that assurance, and plaintiffs—without speaking to the defendants directly—relied on the bank's decision to extend credit in assuming that the system was serviceable. *See id.* at 500.

These cases suggest that so long as the plaintiff receives the substance of a defendant's misstatements, he or she may establish reliance on that information even if the defendant did not communicate with the plaintiff directly. *See Tindle,* 171 N.Y. at 524, 64 N.E. 210 ("[I]t cannot be doubted that the defendant spoke false and deceitful words to the plaintiffs through the agency just as effectually as if they had met face to face, and the statements had been made directly and personally."); *cf. John Blair Comm., Inc. v. Reliance Capital Group, L.P.,* 157 A.D.2d 490, 549 N.Y.S.2d 678, 680 (1st Dep't 1990) ("[A] party who commits intentional fraud is liable to any person who is intended to rely on the misrepresentation or omission and who does in fact so rely to his detriment."). This principle speaks in favor of permitting the SIPC's fraud claim in this case, on the theory that due to the structure of the regulatory scheme, the substance of any misrepresentations Seidman made to the SEC and the NASD were transmitted through those entities to the SIPC itself. In particular, we could find that, because the SIPA provides that the SEC and the NASD only communicate with the SIPC

when a broker-dealer's accounting reports exhibit a problem, their silence regarding Baron conveyed the message—drawn directly from the misrepresentations in Seidman's certified audit reports—that Baron was in good financial health. The effect of such a message would be analogous to a case in which the SEC repeated the audit reports verbatim to the SIPC, which then relied on that misinformation in deciding whether any action was necessary. Because we almost certainly would find reliance in that situation, we similarly might find reliance here, where the SEC and NASD effectively communicated through silence rather than affirmative transmittal of the information.

To find reliance in this situation, however, would involve expanding New York fraud law in a manner best entrusted to the Court of Appeals. Although New York law is fairly clear that a plaintiff may establish reliance on misrepresentations it receives from a third party in a repackaged form, such as a credit rating or a financial report, New York courts have not extended this rule to cover a third party's failure to convey information at all. As the district court correctly noted, the SIPC's theory of reliance "rests on the absence of any activity by [the SEC and the NASD], . . . rather than on any subsequent communication of Seidman's misrepresentation." *Seidman,* 49 F.Supp.2d at 656. This absence of action distinguishes the case before us from the decisions on which the SIPC relies, all of which involve some affirmative activity by a third party based on the defendant's misrepresentations. *See, e.g., Tindle,* 171 N.Y. at 523, 64 N.E. 210 (plaintiff relied on credit rating); *John Blair,* 549 N.Y.S.2d at 680 (plaintiff relied on defendant's certified financial statements); *Caramante,* 494 N.Y.S.2d at 500 (plaintiffs relied on bank's extension of credit); *see also Hyosung Am., Inc. v. Sumagh Textile Co.,* 25 F.Supp.2d 376, 384 (S.D.N.Y.1998) (finding reliance where bank made payments pursuant to letters of credit, for which plaintiff was liable, based on defendant's misrepresentations).

Whether fraud liability encompasses reliance on the absence of communication, rather than on communication itself, is thus currently unclear under New York law. Resolving this issue will involve a detailed analysis of the policy concerns underlying New York's fraud rules, including the sometimes difficult balance between deterring fraud in accounting transactions and protecting accountants against "far-flung liability for inchoate or unintended injuries." *Union Carbide Corp. v. Montell N.V.,* 9 F.Supp.2d 405, 412 (S.D.N.Y.1998). Because the state's highest court is the most appropriate forum for considering these issues, we certify this question to the New York Court of Appeals.

### B. *Negligent misrepresentation*

We find New York law similarly uncertain with respect to the SIPC's claim for negligent misrepresentation. As described above, *see supra* II.B., New York courts have been extremely reluctant to permit recovery for negligent performance by an accountant absent some direct relationship between the plaintiff and defendant. Toward this end, the *Credit Alliance* factors—that the accountant have prepared its audit for a "particular purpose," that the plaintiff be a "known party," and that he or she show "linking conduct" with the defendant—are designed to limit accountants' liability to only those potential plaintiffs to whom they have assumed some duty of care. *See Credit Alliance,* 65 N.Y.2d at 547–48, 551, 493 N.Y.S.2d 435, 483 N.E.2d 110.

Even given these strict limitations, however, this case presents a close question as to whether the SIPC has established the necessary "privity-like" relationship between itself and Seidman. First, we have little trouble finding that the SIPC has satisfied the "particular purpose" requirement. The plaintiffs' complaint alleges, *inter alia,* that Seidman "intended, knew or should have known that the SEC, the

NASD and the SIPC would rely on [the audit reports] in carrying out their respective regulatory, supervisory and protective duties with respect to Baron, in determining whether Baron was in compliance with the applicable financial responsibility rules, and in determining whether Baron was in financial difficulty." Compl. para. 55. The complaint also references a letter accompanying the 1993 audit in which Seidman stated that the audit "was made for the purpose of forming an opinion on [Baron's] financial statements," but that some of its analysis was "supplementary information required by Rule 17a–5 of the Securities and Exchange Commission."[8] *See* Compl. para. 22. Moreover, the record contains a second letter, accompanying the 1992 audit, stating that the report was "intended solely for the use of management, the Securities and Exchange Commission, the National Association of Securities Dealers, Inc. *and other regulatory agencies which rely on Rule 17a–5(g).*" (emphasis added). These allegations are sufficient to suggest that Seidman prepared its audit reports for the "particular purpose" of satisfying Baron's obligations under the SIPA and its implementing regulations.

 Second, whether the SIPC has met its burden of showing that it was a "known party" depends largely on how the Court of Appeals resolves the SIPC's claim for fraudulent misrepresentation. As discussed previously, the "known party" element of a negligence claim requires fulfillment of two distinct factors. A plaintiff must show 1) that he or she is one of a specific, identifiable class of persons; 2) whom the accountant knew would rely on its audit performance. *See, e.g., White,* 43 N.Y.2d at 361, 401 N.Y.S.2d 474, 372 N.E.2d 315; *supra* Part II.B.1. Regarding the first factor, there is little doubt that the SIPC was "known" to Seidman for purposes of this analysis, as the SIPC is not a member of the "indeterminate class of persons" whom the court in *Ultramares* deemed improper plaintiffs in a negligence action. *See Ultramares,* 255 N.Y. at 173–74, 174 N.E. 441 (refusing to find liability where the accountant's client had requested an audit for general exhibition to banks, shareholders, creditors, and customers, "according to the needs of the occasion, on the basis of financial dealings"). Rather, as one of the regulatory bodies designated by the federal securities laws, the SIPC is part of "a known group possessed of vested rights, marked by a definable limit and made up of certain components." *White,* 43 N.Y.2d at 361, 401 N.Y.S.2d 474, 372 N.E.2d 315; *see also AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202, 223 (2d Cir.2000) (finding that plaintiffs were "known parties" where defendants "knew what the [documents] were for and ... knew for whom [they] were intended").

That the SIPC was a "known party," however, does not end our analysis. To satisfy the second *Credit Alliance* factor, the plaintiff must show that Seidman knew the SIPC would rely on its audit performance. As detailed above, *see supra* III.A, whether the SIPC in fact "relied" on Seidman's reports remains an open question under New York law. Should the Court of Appeals answer that question in the affirmative, we will be obliged to find that the SIPC has met its burden on this prong of the *Credit Alliance* test. If, however, the court finds that the SIPC did not rely on Seidman's alleged misrepresentation, we will be unable to classify the SIPC as a "known party" for purposes of a negligence claim against Seidman. We there-

---

8. Rule 17a–5 relates to the audit requirements for securities broker-dealers and includes guidelines for preparing reports on the broker-dealer's membership in the SIPC. *See* 17 C.F.R. § 240.17a–5(e). As we have noted previously, "[i]t is the reporting system created by [Rule 17] that provides the SEC and other regulatory authorities with the information needed to enforce the [SIPA-created] net capital rule." *Redington v. Touche Ross & Co.,* 592 F.2d 617, 622 (2d Cir.1978), *rev'd and remanded on other grounds,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

fore reserve decision on this issue until completion of the certification process.

Finally, turning to the "linking conduct" prong, we find that whether the SIPC has alleged a sufficient nexus between itself and Seidman to satisfy the third *Credit Alliance* factor is also a close question under New York law. As noted above, this requirement ensures that a negligence action will go forward only where the plaintiff has had both direct and substantial contact with the defendant. The SIPC, however, has alleged almost no direct contact with Seidman. The only activity even approaching this threshold is Seidman's filing, as required by federal law, of an annual report with the SIPC regarding the status of Baron's membership in the SIPC. These "supplemental reports" did not address Baron's financial health, but rather analyzed whether the SIPC assessment had been calculated fairly and whether Baron had overpaid on its assessment during the previous year. *See* 17 C.F.R. § 240.17a–5(e)(4). Otherwise, Seidman apparently dealt exclusively with the SEC and the NASD rather than the SIPC itself. Given that courts in New York have declined to find linking conduct based on a single instance of contact between the parties, *see Security Pacific,* 79 N.Y.2d at 705, 586 N.Y.S.2d 87, 597 N.E.2d 1080; *CMNY Capital,* 821 F.Supp. at 161, the Court of Appeals might find that the limited contact the SIPC has alleged here does not support a negligent misrepresentation claim against Seidman.

On the other hand, a second line of caselaw suggests that in certain unique circumstances, where the plaintiff's reliance is the "end and aim" of the defendant's actions, the plaintiff need not establish a direct relationship between the parties to support liability. *See Dorking Genetics v. United States,* 76 F.3d 1261, 1270–71 (2d Cir.1996); *Kidd v. Havens,* 171 A.D.2d 336, 577 N.Y.S.2d 989, 992–93 (4th Dep't 1991).[9] In *Dorking,* we held that a buyer of cattle could state a claim for negligent health certification under New York law even though the defendant's sole contact had been with the seller of the cattle and not the plaintiff-buyer. Because the seller had hired the defendant specifically to certify the cattle for sale, we considered it "enough [to support liability] if the complaint shows reliance by the plaintiff that was the 'end and aim' of the transaction." *Dorking,* 76 F.3d at 1271 (citations and additional internal quotation marks omitted). Similarly, in *Kidd,* the Appellate Division held that a buyer could sue a title company for negligence even though the company's only contact had been with the seller and not the buyer. *See Kidd,* 577 N.Y.S.2d at 992. Although the court acknowledged the general requirement of "linking conduct" between the parties, it observed that the title insurance business was unique in that while the defendant was nominally performing services for the seller, the "end and aim" of the transaction was for the benefit of the buyer. *Id.* at 992–93. (internal quotation marks omitted). As a result, the "custom and usage of [the] profession" dictated a finding of sufficient linking conduct. *Id.*

These cases carve out an exception to the direct-contact requirement that may

9. The Court of Appeals also applied this standard in *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), in which the defendants, public weighers of beans, had supplied weight certificates not only to the seller who had engaged their services but also to the buyer, who had relied on that certificate in making his purchase. The court held that the buyer could sue for negligence despite a lack of privity with the weigher, because the buyer's reliance was not "an indirect or collateral consequence" of the service to the seller but rather was the "end and aim of the transaction." *Id.* at 238–39, 135 N.E. 275. This analysis, however, controls only insofar as it is consistent with *Credit Alliance,* which synthesized *Glanzer* with the more restrictive language of *Ultramares* to arrive at the current three-pronged test for assessing negligence claims against accountants. *See Credit Alliance,* 65 N.Y.S.2d at 546, 550–51, 493 N.Y.S.2d 435, 483 N.E.2d 110 (discussing *Ultramares* and *Glanzer* ).

support the SIPC's negligence claim here. As in *Dorking* and *Kidd,* Seidman's financial reports, while submitted to the SEC, were prepared primarily for the benefit of a third party—specifically, the SIPC. Furthermore, as in those cases, the industry here imposes unique duties on the defendant: federal law requires that a broker-dealers like Baron engage an independent accountant to prepare its audit reports, *see* 17 C.F.R. § 240.17a–5, and evidence accompanying the SIPC's complaint indicates that Seidman tailored its reports to meet those regulations. *Cf. Dorking,* 76 F.3d at 1270 (recognizing a negligence claim "if the contract for services was tailored to the plaintiffs' requirements (thus demonstrating that the defendant understood the plaintiffs' reliance) even if the plaintiffs had never interacted directly with the defendant"). Finally, the defendant repeatedly evinced an awareness that federal law required such information. Reliance by the SIPC (along with other regulators) was, therefore, the "end and aim" of Seidman's transaction with Baron.

Although these cases support the SIPC's negligence claim, we note that neither the New York Court of Appeals nor the majority of departments in the Appellate Division have recognized this "unique circumstances" exception to the linking conduct requirement. Consequently, we are reluctant to rely on this exception in assessing whether the SIPC's claim can survive, and we instead certify this question to the Court of Appeals as well. As with the fraud claim, the New York Court of Appeals is the most appropriate forum to rule on this issue, particularly given the court's clearly expressed desire, as a matter of state policy, to limit accountant liability for negligence to a narrow class of plaintiffs. *See Ultramares,* 255 N.Y. at 179–80, 174 N.E. 441 ("If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences."). We leave it to the Court of Appeals to determine whether the SIPC falls within that group.

## CONCLUSION

For the foregoing reasons, we vacate the district court's finding that the SIPC lacks standing to sue on its own behalf, but affirm its dismissal of the SIPC's and the Trustee's claims brought as subrogees of Baron's customers. With respect to the SIPC's claims on its own behalf for fraud and negligent misrepresentation, we certify the following questions to the New York Court of Appeals:

1. May a plaintiff recover against an accountant for fraudulent misrepresentations made to a third party where the third party did not communicate those misrepresentations to the plaintiff, but where the defendant knew that the third party was required to communicate any negative information to the plaintiff and the plaintiff relied to his detriment on the absence of any such communication?

2. May a plaintiff recover against an accountant for negligent misrepresentation where the plaintiff had only minimal direct contact with the accountant, but where the transmittal to the plaintiff of any negative information the accountant reported was the "end and aim" of the accountant's performance?

Although we certify to the Court of Appeals the questions as framed above, we also wish to make clear that we have no desire to restrict the Court of Appeals' consideration of any state law issues it might wish to resolve in connection with this appeal. Therefore, though our immediate request is for answers to the questions as framed, we would welcome any guidance the Court of Appeals may care to

provide with respect to any state law is-
sues presented by this appeal.